# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CODY CHRISTOPHERSON,<br><br>                          Plaintiff,<br><br>v.<br><br>AMERICAN STRATEGIC<br>INSURANCE CORPORATION,<br><br>                         Defendant. | Case No. 19-CV-202-JPS<br><br><br>**ORDER** |

      In early June 2018, a tree fell on the home of Cody Christopherson ("Plaintiff") and, before repairs could be made, *another* tree fell on the home, resulting in a raze order for the property. Shortly after the raze order was issued, Plaintiff filed this case against his homeowner's insurance company, American Strategic Insurance Corporation ("Defendant"), alleging breach of contract and bad faith in connection with the tree damage, as well as seeking consequential and punitive damages.

      The case was originally filed in Milwaukee County Circuit Court, but was removed to federal court pursuant to 28 U.S.C. § 1332. (Docket #1). Plaintiff unsuccessfully attempted to remand the case to state court under the *Rooker-Feldman* doctrine, and Defendant successfully cabined discovery to the breach of contract claim, which is a prerequisite to the bad faith claim under Wisconsin law. (Docket #24, #38). On October 23, 2019, Defendant filed a motion for summary judgment. (Docket #54). That motion is now fully briefed. For the reasons explained below, the motion will be granted and the case will be dismissed.

1. **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The Court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the [C]ourt that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

2. **RELEVANT FACTS**

    2.1  **Background**

On June 5, 2018, Plaintiff called Defendant—his home insurer—to report that a tree fell on his home, and the home was rendered uninhabitable.[1] Plaintiff held a home insurance policy with Defendant that

---

[1]There is a dispute of fact as to whether Plaintiff told the claims adjuster that the home was uninhabitable. Consistent with the summary judgment standard articulated above, the Court will assume that Plaintiff told the appraiser

spanned August 17, 2017 to August 17, 2018, and covered up to $129,000 in damages to the dwelling, $12,900 in loss of use to the dwelling, and $64,500 in personal property damages. (Docket #76-3 at 1). Upon learning about the tree damage, Defendant ascribed Claim Number 51848-185036 to this claim. For ease of reference, this claim will be referred to as "Claim 1" throughout the Order.

On June 6, 2018, Defendant hired an independent adjuster named Chris Holzem ("Holzem"), to inspect the home. Holzem identified several structural issues with the roof, the sewer, and gas systems, and deemed the home uninhabitable. Holzem, an independent adjustor, told Plaintiff that Defendant would not cover cost of removing the tree from his home, or the cost of Plaintiff staying at a hotel. Nevertheless, Plaintiff paid to remove the tree, and followed up with Defendant multiple times regarding reimbursement for the $4,500 cost of the tree removal. Ultimately, Plaintiff was successful in receiving payment for this expense. However, a July 27 email from Plaintiff to Holzem and Defendant reveals that Defendant had failed to send Plaintiff a copy of Holzem's estimated repairs. (Docket #73-2 at 4).

On July 6, 2018, Defendant tendered $11,081.07 to Plaintiff. This amount included the replacement cost of $6,828.87,[2] as well as the costs of emergency services, the tree removal, and tarping to protect the property from the elements. The letter accompanying the payment instructed, "[s]hould your estimated costs of the covered damages exceed the above

---

that the home was uninhabitable. However, the issue is not material for reasons that will be discussed in Section 3, *infra*.

[2]The replacement cost was $6,828.87; the actual cash value of the home was $6,694.67. (Docket #80 at 9).

listed Gross Claim amount or if there is a dispute in the amount of covered damages, you are requested to contact us prior to the commencement of repairs. We must have an opportunity to inspect or evaluate the discrepancies in damage or the differences in costs associated with the covered repairs. . . .Should the actual repairs be less than our estimated costs[,] the final payment due, if any, will be based on the actual cost incurred to repair or replace your property." (Docket #57-4 at 2). Later that year, Defendant also paid an additional $2,557.42 to cover water damage to the home after a protective tarp was blown away. In total, Defendant paid $13,886.28 for Claim 1.[3]

On July 20, 2018, Plaintiff contracted an independent investigator named Brian Hintze ("Hintze") to draft a report estimating the cost to repair or reconstruct the roof. Hintze estimated that the amount to fully reconstruct the roof would be approximately $37,514.95. Although this estimate was far larger than what Plaintiff received under Claim 1, Plaintiff did not give this report to Defendant until December 2018. Plaintiff did not conduct the repairs identified in the report because he lacked the funds to do so. He also lost his job, and experienced difficulty getting Defendant to pay alternative living expenses.

On August 1, 2018, a public adjustor named Keye Voigt ("Voigt"), notified Defendant that Plaintiff had been displaced from his home due to the tree damage, and sought alternate living expenses. Defendant had previously been made aware that Plaintiff's home was uninhabitable due

---

[3] A keen reader may note that $11,081.07 + $2,557.42 = $13,638.49, not $13,886.28. The Court does not readily discern an explanation for the $247.79 windfall—perhaps it accounts for the alternate living costs provided to Plaintiff, or perhaps it includes personal property. In any case, it does not appear that Plaintiff was short-changed.

to the tree damage. By Plaintiff's own account, on June 14, Defendant requested copies of Plaintiff's receipts. There is no indication that Plaintiff provided these receipts. Plaintiff, through his adjustor, offered them to Defendant as early as July 16, 2018. (Docket #73-2 at 1). Again, however, there is no indication that Plaintiff provided these receipts.

The record is clear that Defendant was reluctant to approve alternative living expenses in advance. On August 9, 2018, one of Defendant's adjusters told Voigt that she would not approve three months of advanced alternative living expenses until a structural engineer inspected the property to evaluate the extent of the roof damage. (Docket #73-5 at 1). Defendant's structural engineer did not complete an engineering report until August 23, 2018.

On August 17, 2018, Defendant began paying alternative housing expenses for Plaintiff. In total, Defendant paid $26,037.00 in alternative living expenses. This exhausted the 2017–2018 policy completely and exhausted all but $363.00 of the 2018–2019 policy. Defendant did not pay Plaintiff any alternative living expenses for the period of June 5, 2018 to August 16, 2018.

As bad luck would have it, on August 28, 2018, a second tree fell on Plaintiff's home. Plaintiff reported this damage to Defendant within a few days, and Defendant ascribed Claim Number 585413-185036 to the event. For ease of reference, this claim will be referred to as "Claim 2" throughout the Order. The damage from Claim 2 was covered by an insurance policy that spanned August 17, 2018 to August 17, 2019. The policy limit for Claim 2 consisted of dwelling coverage of $135,000; personal property coverage of $67,500, and loss of use coverage of $13,500. There is no evidence that Plaintiff conducted repairs on the home after Claim 2 was filed.

Page 5 of 19
Case 2:19-cv-00202-JPS   Filed 08/31/20   Page 5 of 19   Document 85

In September, Defendant sent an investigator to inspect the home and draft another engineering report regarding the damage incurred under Claim 2. Although the investigator drafted the report within a month after conducting the investigation, Defendant did not give the report to Plaintiff until December 2018—after the raze order was issued. Plaintiff, through his adjuster, requested the report several times. Plaintiff also requested a certified copy of his insurance coverage for the period from 2018–2019, in order to confirm coverage limits. As of December 3, 2018, Plaintiff still had not received this information.

On November 21, 2018, the Village of Richfield—where Plaintiff's property is located—issued a raze order to remove the buildings from Plaintiff's property. The raze order was permitted by Wis. Stat. § 66.0413(1)(c), which grants municipalities the authority to "order the owner of [a] building to raze the building" if it is "old, dilapidated or out of repair and consequently dangerous, unsafe, unsanitary or otherwise unfit for human habitation and unreasonable to repair."

On December 4, 2018, Plaintiff submitted a summary of loss sheet for Claim 2, which estimated dwelling damages totaling $141,454.46; Hintze's roof estimate for Claim 1; a demolition proposal totaling $6,884.00; a mitigation invoice for water damage; and another tree removal invoice. (Docket #73-11 at 1). Plaintiff also submitted the raze order, which was issued because the cost of the necessary repairs "far exceed[ed] 50% of the value of the home, making it unreasonable to repair." *Id.* Defendant never provided Plaintiff with the requested demolition payment. Plaintiff lacked the funds to hire a company to raze the house, so he razed it himself. There is no evidence that he provided any invoices or receipts associated with the cost of razing the structure, including for his own labor.

On January 9, 2019, Plaintiff filed this lawsuit. At some point after this lawsuit was filed, Defendant paid $143,384.00 to Plaintiff to cover the damage to his home under Claim 2. According to Defendant, this was the policy limit for the covered value of his home. Plaintiff disputes that this $143,384.00 sum constitutes the entirety of Plaintiff's losses under the insurance policy, and contends that more is owed.

Plaintiff has attached an itemized list of personal property that was damaged, totaling $20,350.76. (Docket #73-1). Defendant claims that Plaintiff never provided them with this documentation. (Docket #84 at 9). There is no evidence that this claim was submitted to Defendant. To date, Plaintiff has received $13,886.28 for Claim 1 and $143,384.00 for Claim 2.

### 2.2 Relevant Contractual Provisions

The Court recites the relevant contract provisions, which are taken from the 2017–2018 policy, below. All citations are to (Docket #76-3). The policy for 2018–2019 contains the same language, though at different page numbers. *See* (Docket #76-6).

> **Coverage A – Dwelling**
> We cover. . .[t]he dwelling on the "residence premises", used mainly as your private residence. . .

*Id.* at 10.

> **Coverage A and B – Special Limits of Liability**
>
> **Damage to Siding, Roofing, and/or Windows**
>
> In the event of damage to siding, roofing and/or windows of the covered dwelling and other structures at the "insured location", we will reimburse you up to 2% of the limit of liability for Coverage A for the cost you incur to replace any undamaged siding, soffit, fascia, roofing material and/or windows of like kind and quality to match those materials that were used to repair or replace the property damaged as a result of a covered peril.

Page 7 of 19
Case 2:19-cv-00202-JPS   Filed 08/31/20   Page 7 of 19   Document 85

*Id.* at 11.

> **Coverage D – Loss of Use**
>
> **Additional Living Expenses**
>
> If a loss by a Peril Insured Against causes the "residence premises" to become uninhabitable, we will cover any necessary increase in living expenses you incur to maintain your normal household standard of living. Payment will be for the shortest time required to repair or replace the premises or permanently settle your household elsewhere.

*Id.* at 13.

> **Additional Coverages**
>
> **Emergency Repairs**
>
> If a Peril Insured Against causes damage to covered property, we will pay the reasonable cost you incur for emergency repairs or measures that are necessary to protect that covered property from further damage.

*Id.* at 14.

> **Ordinance or Law**
>
> We will pay, up to 10% of the limit of liability that applies to Coverage A, for the increased costs you incur due solely to the enforcement of an ordinance or law which requires or regulates:
>
> 1.     The construction, demolition, or repair of that part of a covered building or other structure damaged by a Peril Insured Against;
>
> 2.     The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure. . . You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from. . .demolition.

*Id.* at 16.

**Section I – Conditions**

**What Must Be Done After a Loss**

1. Give notice as soon as reasonably possible to us or our agent;

. . .

4. Protect the property from further damage. If repairs to the property are required, you must:

    a. Make reasonable and necessary repairs to protect the property; and

    b. Keep an accurate record of repair expenses;

. . .

6. Prepare a written inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss for each item. Attach all bills, receipts and related documents that verify or support the information stated in the inventory;

. . .

8. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

. . .

    e. Specifications of damaged buildings and detailed repair estimates;

    f. The inventory of damaged personal property described in 6. above;

    g. Receipts for additional living expenses incurred

We have no duty to provide coverage under this policy if there is a failure to comply with the above duties and that failure is prejudicial to us.

*Id.* at 23.

**How a Loss Will Be Settled**

. . .

2. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

> > a. We will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:
> >
> > > (1) The limit of liability under this policy that applies to the building;
> > >
> > > (2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or
> > >
> > > (3) The necessary amount actually spent to repair or replace the damaged building.
> >
> > . . .
> >
> > b. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.
>
> We will pay within 30 days after:
>
> 1. We reach an agreement with you;
>
> 2. A final judgment is entered, provided that judgment is not appealed; or
>
> 3. An appraisal award is filed, provided that appraisal award is not contested.

*Id.* at 23–24.

## 3. ANALYSIS

### 3.1 Breach of Contract as to Failure to Pay for Repairs

In the insurance context, a breach of contract arises due to an insurance company's "failure to pay the claim in accordance with the policy." *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 374 (Wis. 1978); *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 798 N.W.2d 467, 474 (Wis. 2011) (referring to a breach of contract claim as a "wrongful denial of some contracted-for benefit."). A delay in paying benefits may constitute a breach of contract if the delay is unreasonable. *See Racine Cty v. Oracular Milwaukee, Inc.*, 781

N.W.2d 88, 97 n.8 (Wis. 2010) (explaining that that there is a duty to perform contracts with "reasonable expedience.") (quoting *Milwaukee Cold Storage Co. v. York Corp.*, 87 N.W.2d 505, 511 (Wis. 1958)).

Defendant contends that it has "tendered its full policy limits to the Plaintiff," that it "approved Additional Living Expenses since the Plaintiff notified ASI of the need for such expenses in August of 2018," and that its payment of $143,384.00 constitutes the entirety of the "undisputed losses in the case." (Docket #56 at 1). Plaintiff argues that it is owed an additional $37,514.95, among other costs, which is the amount that Hintze estimated it would cost to repair the roof after Claim 1 was filed. Plaintiff contends that Defendant's failure to pay this amount following Claim 1 was a breach of its contractual duty, and the failure to pay the costs for the repairs resulted in increased damage under Claim 2.

The contract states that, for "Coverage A" items, including damaged parts of a covered dwelling, Defendant would "pay no more than the actual cash value of the damage until actual repair or replacement is complete." (Docket #76-3 at 24). Here, it seems that Defendant paid the estimated replacement cost, rather than the actual cash value, though the cost differential is less than $200. (Docket #80 at 9). Perhaps this was a mistake on Defendant's part. In any case, there is no evidence that Plaintiff undertook any repairs and replacements, or submitted those claims to Defendant following the event that gave rise to Claim 1. There is also no evidence that Plaintiff provided alternative estimates to the cost of repair or replacement, as prompted in the letter tendering the $11,081.07. (Docket #57-4 at 2). By the terms of the contract, Plaintiff would only be entitled to the $37,514.95 if he incurred that cost in replacing the home. As Plaintiff points out, a breach of contract occurs "when performance is due." 23

Williston on Contracts § 63:1 (4th ed.). Performance was not due here because there was a condition precedent to Defendant's payment; namely, that Plaintiff incur costs to repair the roof, first.

For similar reasons, Plaintiff's claim that the failure to pay $37,514.95 in emergency repairs is unavailing. It is true that Defendant promised to "pay the reasonable cost you incur for emergency repairs or measures that are necessary to protect that covered property from further damage. . ." (Docket #76-3 at 14). However, in a separate provision, the contract explains that "[i]f repairs to the property are required, you must: (a) make reasonable and necessary repairs to protect the property; *and* (b) keep an accurate record of repair expenses." *Id.* at 23. (emphasis added). This suggests that it was incumbent on Plaintiff to conduct the emergency repairs, not Defendant. Aside from purchasing and installing the protective tarp, which was compensated, there is no evidence that Plaintiff incurred expenses for emergency repairs that were necessary to protect the property from further damage. Plaintiff argues that if repairs had been made in July or early August, then the second tree would have resulted in less damage. That may well be, but the contract does not require Defendant to have made these repairs—only to have paid for them once Plaintiff made them.

Plaintiff also claims that he is entitled to $2,580 under a policy that replaces undamaged siding, roofing, or windows so that they match the materials used to replace the damaged portions of the property. Again, this provision provides for reimbursement "up to 2%. . .for the cost you incur to replace any undamaged" features related to the property under Coverage A. *Id.* at 11. There is no evidence in the record that Plaintiff ever incurred any costs in replacing undamaged siding, roofing, or windows,

and that Defendant failed to pay 2% of their cost. Therefore, there is no breach of contract on this issue, either.

Finally, Plaintiff's claim that he is entitled to consequential damages falls short for want of evidence. Plaintiff contends that if Defendant had paid the initial $37,514.95 cost to repair and replace the damage to his home after the first tree fell, then the second tree would not have caused quite so much damage, and he would not have suffered the raze order in November, 2019. However, as the discussion above demonstrates, by the terms of the contract, Plaintiff was not entitled to $37,514.95 outright. He was entitled to reimbursements of the costs associated with repairing and replacing the roof of his home. Indeed, the only thing Defendant agreed to pay was the actual cash value of the damage—it would only pay the costs of repairs *after* they were made.

The fact that Defendant apparently paid the estimated replacement cost, rather than the actual cash value, is puzzling. But there is no evidence that Plaintiff provided Defendant with Hintze's $37,514.95 estimate at any point that summer, which would have given Defendant some notice that its initial figure was far too low. More to the point, there is no evidence that Plaintiff undertook any repairs that would, or should, have triggered Defendant's duty to pay under the policy. Therefore, there was no breach of contract, and consequential damages are inappropriate.

### 3.2 Breach of Contract as to Failure to Pay Alternative Living Expenses for Claim 1

Plaintiff also claims that Defendant breached the contract by failing to pay alternative living expenses for the period of June 5, 2018 to August 17, 2018. The contract states that if the residence is "uninhabitable," Defendant "will cover any necessary increase in living expenses you incur

Page 13 of 19
Case 2:19-cv-00202-JPS   Filed 08/31/20   Page 13 of 19   Document 85

to maintain your normal household standard of living." (Docket #76-3 at 13). In the "Conditions" section, the contract requires Plaintiff to send Defendant "Receipts for additional living expenses incurred" . . . "within 60 days after our request." *Id.* at 23. Like the other terms of the contract, it seems that this provision required Plaintiff to incur the cost first. The parties' briefing suggests that there was some mechanism by which alternative living expenses could be approved upfront for a longer period of time; however, the insurance contract is silent on any such protocol, and the parties do not point to any other standard governing claims under Coverage D – Loss of Use. The Court is left to wonder when and whether Defendant made the "request" that would trigger the 60-day timeline to provide receipts, but the parties do not litigate this issue, so the Court must assume it is immaterial.

The record suggests that as early as June 14, an adjuster employed by Defendant told Plaintiff that he would need to submit receipts for the time spent in a hotel. Plaintiff has not provided any evidence that he provided receipts or proofs of payment for his alternative living expenses between June 5, 2018 and August 16, 2018. Nor has Plaintiff provided any evidence that, under this or any other contract, Defendant was obligated to advance him the alternative living funds. Therefore, there is no evidence that Defendant breached the contract.

### 3.3 Breach of Contract for Failing to Pay Costs Incurred due to Raze Order

Plaintiff contends that Defendant breached a provision of the contract that requires payment of up to 10% of the costs of complying with a law requiring the demolition of a property. As with the other provisions

at issue in this contract, the obligation for Defendant to pay is triggered by Plaintiff incurring costs.

There is some evidence that Plaintiff's public adjustor provided Defendant with the estimated cost of the demolition, and Defendant failed to pay it up front. Since Plaintiff did not have the money to pay for the demolition, he used his own manual labor to demolish the dwelling, and incurred the costs of debris removal. It appears that the costs of debris removal were paid, (Docket #69 at 28), therefore, the only remaining issue is whether Defendant failed to pay Plaintiff for his manual labor.

It is reasonable that Plaintiff would be entitled to the costs of his own labor; however, there is no evidence that he submitted such a claim to Defendant. Therefore, Defendant's duty to pay under the contract was never triggered. Plaintiff must have given Defendant the chance to pay the reasonable costs associated with his labor under the contract before claiming breach of contract. The Court is constrained to deny this claim, as well.

### 3.4 Breach of Contract for Failing to Pay for Personal Property Damage

Plaintiff also contends that Defendant breached the insurance contract by failing to compensate him for damage to his personal property. The contract requires individuals who have incurred a loss for personal property to "prepare a written inventory. . .showing the quantity, description, actual cash value and amount of loss for each item. Attach all bills, receipts and related documents that verify or support the information stated in the inventory. . ." (Docket #76-3 at 23). The contract also requires, within 60 days after Defendant's request (whatever that is, and whenever that occurred), a "signed, sworn proof of loss" that sets forth certain details

of insurance coverage. *Id.* The contract disclaims any "duty to provide coverage under this policy if there is a failure to comply with the above duties and that failure is prejudicial to us." *Id.*

In support of his case in federal court, Plaintiff's claims adjuster provided a claim for loss of personal property totaling $20,850.96. (Docket #73-1). Defendant explains that this is "the first time some twenty months after the loss" that it received notice of such a claim and argues, reasonably, that it "cannot be liable for delaying a claim it does not know about." (Docket #77 at 14). Plaintiff has not provided any evidence that he provided this list to Defendant, which, facing Defendant's claim that it never received the list, might constitute a genuine issue of material fact.

Unfortunately, nowhere in Plaintiff's opposition, or in his proposed findings of fact, or in his public adjustor's declaration, or in his own declaration, does he—or anyone—attest that that Defendant received this list *before* the lawsuit was filed. It is not enough for Plaintiff to simply contest Defendant's characterization of the facts; at this juncture, he must provide at least some evidence that he has been wronged. *See* (Docket #84 at 9) (vague and baseless objection to Defendant's statement of fact that Plaintiff never provided the itemized list of personal property damage totaling $20,350.76); Civ. L.R. 56(b)(2)(B)(i) (requiring a party disagreeing with a statement of fact to cite "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon."). Plaintiff has not pointed to any evidence that he gave Defendant notice of this claim, or that Defendant knew of any obligation to pay this amount. Therefore, this claim, too, must be denied.

### 3.5 Bad Faith

In Wisconsin, as between an insurance company and the insured, it is well-settled that a bad faith claim requires "an absence of a reasonable basis for denial of policy benefits and the knowledge or reckless disregard of a reasonable basis for a denial." *Anderson*, 271 N.W.2d at 693. "[T]he tort of bad faith is not a tortious breach of contract. It is a separate intentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract." *Id.* at 687. Thus, "an insurer's bad behavior does not ripen into a bad faith claim unless and until there has been a breach of the insurance contract." *Burnett v. Country Mut. Ins. Co.*, Case No. 12-CV-19-SLC, 2012 WL 12995656, at *4 (W.D. Wis. Apr. 3. 2012).

Plaintiff encourages the Court to find that Defendant's delay in paying him during the summer of 2018 constitutes a breach of their duty of good faith and fair dealing, and thus a breach of the insurance contract, such that a claim of bad faith would be proper. Plaintiff did not plead a breach of the duty of good faith and fair dealing; although, even if he had, the discussion above demonstrates that there is no evidence that Defendant breached that duty.

The record demonstrates that when Defendant received invoices for covered expenses, it paid those invoices with reasonable promptness. The record also demonstrates that Defendant's only obligation under the insurance contract was to pay expenses as Plaintiff incurred them. While there are two instances where Defendant seemed willing to pay more than the bare minimum required under the contract (for example, in advancing costs for alternative living expenses, and in paying the initial estimated replacement cost up front, instead of the actual cash value for the damaged

dwelling), by the contract's terms, Plaintiff was not entitled to anything other than what he received.

Moreover, the record suggests that Plaintiff did not take the initial steps that would have triggered Defendant's duty to pay certain expenses now sought. Plaintiff did not always provide Defendant with receipts, invoices, or itemizations of the expenses that he incurred (though when he did, he was compensated), and he did not undertake repairs of any of the items for which he now seeks compensation. The Court also notes that for some reason, Plaintiff chose to believe an independent investigator's opinion that alternative living expenses would not be covered, which set him back several weeks—even though Plaintiff's insurance contract provided that they could be covered, and even though Defendant's adjustor requested receipts for reimbursement. There is no evidence of a breach of contract, and even less evidence of bad faith. For these reasons, the Court must deny the bad faith claim.

### 4. CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment will be granted, and the case will be dismissed with prejudice. The next time either party files a lawsuit in this Court, they are encouraged to follow Civil Local Rule 56(b) to the letter. The Court did not appreciate the scattershot presentation of facts, and, in the future, may not be so charitable as to entertain them.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #54) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of August, 2020.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge